[Civ. No. 32381. Second Dist., Div. Four. Dec. 18, 1968.]

CHARLES HASEKIAN, Plaintiff and Appellant, v. RICHARD KROTZ et al., Defendants and Appellants.

James E. Green for Plaintiff and Appellant.

Grossman & Barr, Bernard M. Avidan, Henry A. Fox and Mervin Glass for Defendants and Appellants.

COLLINS, J. pro tem.*—Two separate appeals are here presented, the first by one of the original plaintiffs (Hasekian) and the second by the defendants against whom judgment was rendered. Hasekian contends that the court erred in awarding him a judgment for only $12,000, and that he should have been awarded $72,000. Defendants, on their appeal, contend that a judgment in any amount was improper under the law and the facts.

Chronologically stated, these are the pertinent facts:

The defendant Longhollow Land & Livestock Company is a limited partnership composed of David T. Shiffman and Robert Overtree, as general partners. They owned approximately 6,000 acres of unimproved land in Madera County (hereafter called the acreage) which is the subject of sale herein. (Hereinafter the partners will be referred to collectively as the partnership.)

Sometime prior to August 1965 the partnership orally authorized defendant Richard Krotz, a licensed real estate broker, to find a buyer for the partnership's acreage and agreed that Krotz should be paid a commission for finding such a buyer equal to all of that portion of the selling price in excess of $188 an acre. During August 1965 Krotz represented to one of the plaintiffs, Charles Hasekian (who at no time was licensed as a real estate broker or salesman) that he had an exclusive listing agreement with the owners of the acreage, and that he (Krotz) would receive approximately 16 percent of the gross selling price if Hasekian would introduce Krotz to a buyer for the acreage.

Later, on September 6, 1965, a written agreement between Hasekian and his associate, Glen E. Clever (a licensed real estate broker) was made with Krotz. In that agreement, Krotz acknowledged that through the efforts of Clever and Hasekian, one C. Jon Handy was being introduced to Krotz,[1] and that they would be paid "a commission and finder's fee totaling 6%" based on the gross sales price of $225 an acre for approximately 6,020 acres in case a sale was made to Handy or his associates. The agreement also provides that Krotz and his associates "are bound to submit any future land or develop-

---

*Assigned by the Chairman of the Judicial Council.

[1]Actually, Krotz and Clever were not acquainted at that time. The agreement was signed by Hasekian, on behalf of Clever, pursuant to their standing oral agreement to split any fee or commission which the services of either should earn; in this instance the agreed "split" was to be a payment of $5,000 to Clever by Hasekian.

ment packages or propositions through GLEN E. CLEVER and CHARLES HASEKIAN who have originally arranged this meeting as a consideration for their efforts.'' The agreement recites that it shall be binding for a period of three years from its date.

Following the signing of the agreement Hasekian introduced Krotz to Handy. Shortly thereafter Hasekian assisted Handy and the latter's employee Mandella in gathering desired information concerning the acreage, which will be treated in detail later.

At the trial Hasekian testified that in performing these acts, he was motivated by a desire to participate in the development of the acreage; and that at one time Krotz wrote him that there was a probability that he would participate in the development profits. Hasekian did not meet defendant property owners until after the close of escrow, and except for the first meeting, he did not discuss the deal with Handy until after the escrow closed in February 1966.

Clever, an original plaintiff, and party to the written agreement with Krotz, did not personally meet any of the principals to the sale, or Krotz himself, until the time depositions were being taken in the present action which was filed on January 28, 1966.[2] Admittedly, he did not participate at any time in any phase of the sale transaction.

On February 10, 1966, C. Jon Handy (acting through his nominee, Palm Springs Panorama, Inc.) consummated the purchase of the acreage on terms somewhat different from those recited in the agreement of September 6, 1965, between plaintiffs and Krotz in that the price was reduced from $225 to $193 per acre, a total of $1,200,000 for approximately 6,220 acres, with a down payment of $165,000 and a third trust deed to secure payment of the balance. By reason of these changes, the sellers and Krotz renegotiated their earlier oral agreement for a commission[3] and by written agreement dated February 10, 1966, the partnership agreed to pay Krotz the sum of $71,400 (i.e., 6 percent of the gross sales price of $1,200,000) of which $12,000 was payable in cash at the close of the escrow and the balance at the rate of 20 percent of all

[2]The trial court made a specific finding that Clever's claim was barred by Civil Code, section 1624, subdivision 5, and the judgment denied him any recovery. He has not filed an appeal so the judgment is final as to him.

[3]The adjustment in price per acre and term of payment resulted because the partnership insisted that its ''house broker,'' one Richard Gonzales share in the sales commission.

future payments made by the buyers on account of the third trust deed.

Plaintiffs' complaint contained three counts, one for declaratory relief, another for damages for anticipatory breach of plaintiffs' agreement with Krotz, in an amount equal to 6 percent of the sale price of the acreage at $225 an acre, namely, the sum of $78,000, all as provided in the written agreement of September 6, 1965, and a third cause of action to enjoin payment of any fund in escrow to Krotz until plaintiffs' rights therein have been determined.

The answers filed by the several defendants disclaimed liability to the plaintffs and raised numerous affirmative defenses. The defenses which are relevant in the light of the evidence are these: Hasekian did not function as a mere finder or middlemann but as a real estate broker or salesman and since he admittedly was not licensed as such, he may not recover; the written agreement with Krotz was unenforceable because it violated public policy in its provision to split a real estate broker's fee or commission with an unlicensed person; Hasekian's contention that Krotz was an employee of the partnership owners, and, as such, he had authority to engage Hasekian's services in their behalf and as their employee, is untenable in fact because never authorized by the partnership and unenforceable in law because there was no written agreement for such employment and otherwise none could be inferred.

Following the trial the court made findings to the effect that in making an oral agreement with Krotz, the partnership "did not advise him not to hire assistants" for the purpose of finding a buyer for the acreage "or that they would not be bound for the compensation of any such assistants," and that "the hiring of plaintiffs was incidental to the finding of a buyer . . . and that it was reasonably necessary for that purpose."

As to the services performed by Hasekian, the court found as follows:

"[T]hat CHARLES HASEKIAN assisted the purchaser, C. JON HANDY, in gathering data and information pertaining to the subject property, made two or three trips to Madera County to check the development potential of the said property, conferred with the County Planning Commission, with water experts, surveyors and engineers. The Court finds that this activity did not amount to rendition of services as a real estate

broker or real estate salesman, and finds that CHARLES HASEKIAN was acting in the capacity of a finder.''

The court further found:

''[T]hat neither of the plaintiffs consented to any reduction of their finder's fee, nor did either of said plaintiffs participate in any negotiations concerning the sale of said rea property or concerning fee arrangements as between the defendants, LONGHOLLOW LAND & LIVESTOCK COMPANY, ROBERT OVERTREE, DAVID T. SHIFFMAN, and their agent, defendant RICHARD KROTZ.''

Resolution of Hasekian's claim hinges upon his status as a real estate broker or salesman on the one side or as a finder or middleman on the other.

The Business and Professions Code (ch. 3, art. 1) treats the subject of brokers and salesmen with particularity. Section 10131 defines a real estate broker in part as follows: ''A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation. does or negotiates to do one or more of the following acts for another or others: (a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale, or exchange of real property or a business opportunity.''

Section 10132 (as effective at the time of the subject transaction) defines a real estate salesman: ''A real estate salesman within the meaning of this part is a natural person who, for a compensation or in expectation of a compensation, is employed by a licensed real estate broker to do one or more of the acts set forth in Sections 10131, 10131.1 and 10131.2.''

Section 10133 enumerates persons and services to which the foregoing definitions do not apply. The exceptions there enumerated do not apply here.

█ At trial the defendants urged upon the trial court the argument that Hasekian's claim to a finder's fee was barred by Civil Code, section 1624, subdivision 5, as amended in 1963, to require an agreement ''. . . to procure, introduce or find a purchaser or seller of real estate . . .'' to be in writing. The argument, however impressive on its face, was rejected by the court on the basis of this court's interpretation of the amended section. In *Porter* v. *Cirod, Inc.* (1966) 242 Cal.App.2d 761 [51 Cal.Rptr. 784] this court ruled that since the context of subdivision 5 had reference only to ''an agent or broker,'' it would presume that the Legislature

intended that the amendment should be limited to those classes without changing in any wise the prior decisional rule that an unlicensed person's agreement for a finder's fee need not be in writing. (*Crofoot* v. *Spivak,* 113 Cal.App.2d 146 [248 P.2d 45]; *Palmer* v. *Wahler,* 133 Cal.App.2d 705 [285 P.2d 8].)

The anomaly resulting from the decision, namely, of permitting an unlicensed person to enforce an oral agreement while at the same time enforcing the statute to deny such right to a licensed real estate broker or salesman undoubtedly accounted for the trial court's finding that Clever, the licensed broker, could not enforce the oral agreement, but that Hasekian, a nonlicensee, could do so. We regard the *Porter* decision as binding here[4] and we conclude that in 1965 when the negotiations took place an oral agreement for a finder's fee would be enforceable by such a nonlicensee.

■ Notwithstanding the rule that in 1965 Hasekian could enforce an oral agreement for the payment to him of a finder's fee, we find no basis whatever upon which the judgment against the defendant partnership can be upheld.

Hasekian's theory is that the partnership hired Krotz and impliedly authorized the latter to engage assistants, who would be agents of the partnership.

On this phase of the case, the trial court found that the defendant partners orally authorized Krotz to find a buyer, that "they did not advise him not to hire assistants for that purpose or that they would not be bound for the compensation of any such assistants. . . ." This finding, negative in form, is even more negative in legal effectiveness. It is entirely nugatory. Moreover, in view of the evidence in the record the trial court could hardly have made a finding that Hasekian was the agent of the partnership. The partners testified positively, and their testimony was not refuted, that they never had any dealing with Hasekian or Clever; that they never had any correspondence with either of them; that they first met Hasekian in court during the trial (February 17, 1967), that they never authorized Krotz to engage any assistants; that at a time not recalled Krotz had told them that with the man who took him to meet Handy he had "an arrangement . . . on the basis of some participation" in commissions.

---

[4]In 1967 the Legislature put an end to this anomaly by further amending Civil Code section 1624, subdivision 5, by adding the words "or any other person," with the result that now a finder's agreement by whomsoever made must be in writing.

As to their dealings with Krotz the record discloses that Krotz initiated a contact with the partners with a view to selling their property; that partner Shiffman discussed the matter with Krotz, and told him that before dealing with him, the partners wanted to know more about him, his background and his ability; that at a later meeting, Krotz supplied information and the names of some of the people for whom he had rendered services; that the discussions culminated in Shiffman telling Krotz that the partnership had no objection to him working on the sale of the property but "only an open listing, not an exclusive listing," because they were discussing a sale with other people and there were several other brokers who had expressed interest in the matter; and that at no time was Krotz authorized to hire any sub-agent, assistant, or finder. Such evidence hardly supports a contention that Krotz had implied authority to hire Hasekian as the partnership's agent. (See *Goodwin* v. *Glick*, 139 Cal.App.2d Supp. 936 [294 P.2d 192].) Hasekian's brief cites general principles of law contained in Restatement Second of Agency (§§ 50 and 64) but we deem them so inapposite as to merit no specific consideration here. At most Hasekian was an agent of Krotz (see Civ. Code, § 2350).

We also find meritorious defendant partners' alternative defense that any agreement relating to the sale of the property would be unenforceable against them unless it was in writing. (Civ. Code, § 1624, subd. 5.) It is conceded that on September 6, 1965, when plaintiffs entered into a written agreement with Krotz, the latter had no written agreement with the partnership. Consequently, at that time he had no enforceable rights against the partners. This being so, we are unable to perceive any legal basis on which Krotz might obligate the partnership to compensate the persons whom Krotz engaged to find a buyer.

Hasekian's reply brief urges that the doctrine of ratification operates to support his claim against the partnership. The facts he relies upon to support this contention are the events which occurred during the pendency of a sale escrow in December 1965 and January 1966, after Hasekian had filed in the escrow a demand for payment and Handy's broker, Gonzales, was demanding a share of the brokerage fee claimed by Krotz, which matters, along with others, was delaying closing of the escrow. Apart from the fact that the issue of ratification was not the subject of any finding by the trial court, and apparently was not presented as a specific

issue at the trial, we do not regard the evidence as sufficient to support such a finding in any case. Hasekian's brief concedes that on the narrow question whether the unauthorized act of a real estate broker in hiring a sub-agent may be subsequently ratified by the principal, no California appellate court decision has been found. Nor have we found any controlling decision or authority. The annotations in 136 A.L.R. 1416, *et seq.* cited by counsel have not been particularly helpful. We conclude that there was no ratification as contended. Hasekian's contention that the partnership "not only knew that Krotz had committed a fraud" on Hasekian, "but they actually sanctioned such fraud and are now attempting to rely" upon it as a defense. This *ad hominem* argument finds no support in the record and deserves no consideration by us.

There remains for determination the question whether Krotz alone is liable to Hasekian. We are not here concerned with the collateral charges in the brief that Krotz deceived the plaintiffs in telling them in August 1965 that he had an exclusive brokerage agreement with the partnership, nor with the charge that Krotz practiced fraud upon them on February 10, 1966, when he became a party to a written agreement which reduced the commission payable to him under an earlier oral agreement. We are here concerned only with rights and obligations of the parties under their written agreement of September 6, 1965, which is the agreement pleaded in the complaint and upon which plaintiff relies entirely.

Determination of the question thus presented depends upon whether Hasekian performed services of the character befitting a finder or whether he functioned as a broker or salesman.

There is no statutory definition of a "finder" or middleman in the context here presented. However, sketchy definitions have evolved out of appellate court decisions which deal with transactions involving real estate, corporate securities and various banking operations. The concept of "finder" is a very polarized one which does not coalesce with the "broker" "agent" or "salesman" categories or even extend to the penumbral areas of the latter callings.

In a somewhat different and unrelated factual context our Supreme Court recently had occasion to distinguish a finder or middleman from a broker. In so doing, the court in *Batson* v. *Strehlow* (1968) 68 Cal.2d 662, at pages 667, 668 [68

Cal.Rptr. 589, 441 P.2d 101], observed: "However, we do not adjudicate defendant's legal status by a mere labeling process. In scrutinizing the record, we assess his function in the transaction by the role he played as well as by his description in the cast; we consider what he did, as well as what he was called."

In *Crofoot* v. *Spivak* (1952) 113 Cal.App.2d 146, 147 [248 P.2d 45], the court held that recovery could be had "for introducing a prospective purchaser to a property owner desiring to sell his properties, *nothing more being done than the bare act of introduction.*" (Italics added.)

The *Crofoot* case, *supra*, cites the earlier case of *Shaffer* v. *Beinhorn* (1923) 190 Cal. 569 [213 P. 960]. There plaintiffs sued a real estate broker, as here, to recover under an agreement which, according to the complaint, provided that in the event plaintiffs, or either of them, "would find anyone interested in the purchase of such a ranch, to whom the said defendant would be able to negotiate a sale thereof, or would introduce to said defendant anyone to whom the said defendant would be able to negotiate a sale thereof," they would be paid a portion of the gross sales commission. Then followed an allegation that plaintiffs procured and produced to defendant a prospective purchaser to whom defendant negotiated a sale of the subject ranch. Defendant's demurrer attacked the complaint on the ground that plaintiffs did not allege their status as licensed brokers. The court held that on its face the complaint did not show that plaintiffs were engaged in the business, or acting in the capacity, of brokers when they performed the act for which they sought compensation, that their only duty was "to produce a prospective purchaser," leaving "negotiations" of the sale entirely to defendant. ■ Citing *Schomig* v. *Keiser* (1922) 189 Cal. 596 [209 P. 550] for an observed parity of reasoning, the court further remarked (at page 574) that "the employment of any person to perform an act preceding the negotiation of a sale does not, *in the absence of subsequent assistance rendered in the ultimate negotiation of the sale* constitute the party thus employed a real estate broker, or real estate salesman." (Italics supplied.)

*Evans* v. *Riverside Intl. Raceway* (1965) 237 Cal.App.2d 666 [47 Cal.Rptr. 187] was concerned with determining the status of a claimant as a finder or as a corporate securities broker required to be licensed by Corporations Code, section 25700. ■ The court in summarizing some of the distinctions as gleaned from earlier decisions concluded as follows

(237 Cal.App.2d at pp. 675-676) : " 'A person is not a broker . . . where he merely brings a buyer and a seller together so that *they may make their own contract without aid from him,* but any participation, however slight, in the negotiations will bring him within the definition.' [Citations.]

Hasekian relies heavily on the decision in *Freeman* v. *deal which they themselves negotiate and consummate*) and a interests, introduces and brings the parties together *for the* broker (whose duty is to bring the parties to an agreement on his employer's terms) has been noted in all the decisions dealing with the subject [citations]. A more precise designation for a finder would appear to be an "intermediary" or a "middleman."

" 'The services performed by finders may vary from case to case. But their distinction from the status of a broker, if the circumstances of the particular case require such a distinction to be drawn, lies in their bringing the parties together *with no involvement on their part in negotiating the price or any of the other terms of the transaction. . . .' "*

 " 'The same distinction between a finder (who finds, *Jergins* (1954) 125 Cal.App.2d 536 [271 P.2d 210] where the court held that the plaintiff Freeman had not acted in the capacity of a securities broker, although the evidence showed that after introducing the prospective buyer (John W. Lee, a representative of Smith, Barney & Company, a New York investment firm) to the defendants (Jergins, Stanley & Cotton, executors of an estate), he had engaged in the following activities (125 Cal.App.2d at p. 547) : " '(1) Attended meeting at which initial negotiations between Lee and appellants took place. (2) Loaned automobile to Lee for his use in inspecting Jergins Oil Co. property. (3) Took Lee to Long Beach to inspect Jergins Trust Building and confer with company officials. (4) Brought Lee back from Long Beach and discussed Jergins Trust Building and "the deal." (5) Met with Lee at least twice thereafter and discussed "the deal." (6) Took Lee to railroad station and discussed status of transaction. (7) Played golf with Hill of Chase National Bank accompanied by Barten of Smith, Barney & Co., during their negotiations with appellants.' " The reasoning of the court in holding that Freeman's activities did not require him to be licensed as a broker is reflected in the following passage from the opinion (125 Cal.App.2d at p. 546) : "The next phase of the question arises from the claim that plaintiff

322

is claiming compensation for services for which he was required to be licensed, namely, offering the property of the defendants for sale and negotiating for a sale of it. Although this contention is advanced with much vigor, we are of the opinion that it is without merit. In the first place, plaintiff had done everything that he was required to do when he brought about the introduction of Lee. That constituted performance on his part, and it is that performance and nothing else for which he seeks compensation. If he did more than that it was not in performance of anything that he had undertaken to do or was required to do in order to earn his compensation. He is not suing for compensation earned as a result of his efforts in effecting a sale, but claims it solely on the basis of his introduction of Lee and the results of the efforts of Smith-Barney. Even if he had engaged in some activity that was not required of him, and which was wholly apart from the full performance of his agreement, this would not be a defense against liability of the defendants to him for the full performance of a valid agreement in a lawful manner. But aside from this, we are unable to see that plaintiff engaged in any activity which, as a matter of law, amounted to the rendition of services, or acting in the capacity of a broker.''

In the present case the activities in which Hasekian engaged, after introducing Krotz to Handy, are listed in defendant partnership's brief and have been verified in the record as follows:

(a) Presented a ''package'' to several people. (A package is described as a booklet containing description, location and other attributes of a property.)

(b) Drove to Fresno and met with prospective buyers.

(c) Drove to property when the prospective buyers desired to make an inspection.

(d) Proceeded to investigate the property and local ordinances applicable to its development and use after it became apparent that prospects were interested.

(e) Visited the Madera County Planning Department on several occasions in October 1965 to get information concerning ordinances for the development of the property.

(f) Worked on the water problems connected with the property.

(g) Accompanied Mr. Mandella (Handy's employee) to engage a surveyor-engineer to survey the property.

(h) Made two trips to civil engineer Greenwood's office at Fresno.

(i) Assisted in getting a price from Mr. Greenwood for surveying the property.

(j) Talked with another surveyor.

(k) Obtained a price for the boundary survey as well as an estimate on the engineering for developing the property.

(l) Secured an engineering estimate from a third source.

Most of these activities on the part of Hasekian occurred prior to Handy's commitment to purchase the acreage.

Hasekian's admitted activity in studying the maps and exhibits in the package to acquire familiarity with the location and terrain, and in submitting "the package" to three or four other prospects all bespeak services of a character normally performed by a broker, but not by a finder. Nor is he readily cast in the role of "finder" by his further activities in consulting public records and ordinances regarding planning regulations and in conferring with engineers and surveyors concerning water problems. In the overall setting we may not ignore the actual relationship between Hasekian and Clever as placed in perspective by Hasekian's following testimony: ". . . . I was giving Mr. Clever one of the packages and I had a side agreement with him that if he found a buyer I would give him $5,000 from my fees. That is the whole thing."

The record further discloses that Clever did nothing and Krotz did very little to insure the ultimate commitment by Handy to purchase the property. We can only speculate whether or not Krotz left matters to Hasekian due to his inability to function effectively because as alleged in the complaint "Richard Krotz is financially insolvent and would immediately expend . . . [the expected commissions] in satisfaction of his own personal obligations. . . ."

While it is regrettable from Hasekian's viewpoint that he failed to comply with the Real Estate Brokers Act by obtaining a license, the controlling fact is that he functioned as a broker and the trial court's finding to the contrary is not supported by the evidence. This requires reversal of the judgment in favor of Hasekian. This determination also effectively disposes of both Hasekian's appeal and the cross-appeals of the several defendants and renders unnecessary consideration of other grounds of appeal stated in the briefs.

The judgment is reversed. Defendants, appellants and respondents David T. Shiffman, Robert Overtree and Longhol-

low Land & Livestock Company shall recover their costs of appeal as against plaintiff Hasekian; defendants, respondents and appellants Krotz and Baron's Realty Corporation shall bear their own costs on appeal.

Jefferson, Acting P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied January 6, 1969, and the judgment was modified to read as printed above. The petition of the plaintiff and appellant for a hearing by the Supreme Court was denied March 5, 1969.