[S.F. No. 22892. In Bank. Mar. 9, 1973.]

NORMAN TYRONE, Plaintiff and Respondent, v.
WILLIAM K. KELLEY et al., Defendants and Appellants.

**COUNSEL**

David W. Lennihan and Brobeck, Phleger & Harrison for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert E. Wenig, Assistant Attorney General, and Richard I. Gilbert, Deputy Attorney General, as Amici Curiae on behalf of Defendants and Appellants.

Thorne, Clopton, Herz & Stanek, John E. Thorne and Elizabeth Cobey for Plaintiff and Respondent.

Bernard Reich as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**THE COURT.**—Defendants appeal from a judgment for plaintiff Norman Tyrone in this action to recover a fee for finding a lender which committed itself to loan defendants up to $7,000,000 for a construction project.

In 1963, defendant Hare, Brewer & Kelley, Inc., a corporation, initiated plans to develop a shopping center and office building in Palo Alto, with construction to be undertaken by defendant Triad, a limited partnership.[1] The construction project was widely publicized.

In May of 1963, after a telephone conversation between William K. Kelley and Norman Tyrone, a letter subscribed "Financial Services, Ltd., Norman Tyrone, President" was sent to Kelley from Tyrone's office in Atlanta, Georgia, offering help in securing a loan for the construction of the planned buildings. There was apparently no immediate follow-up on the letter, and neither Kelley nor Tyrone remember either the telephone conversation or the letter, characterized by Tyrone as a general flier and by Kelley as similar to many letters he received as a result of the publicity on the project.

In the summer of 1963, William Hammond visited Ryland Kelley to interest him in a plan for financing residences. On this visit, Kelley told Hammond about Triad's desire for a $14,000,000 loan to finance the

---

[1]The general partners of Triad at this time were William K. and Ryland Kelley; Alma Developments, a limited partnership; Portola Development Company, a corporation; and Hare, Brewer and Kelley, Inc.

construction of the office building and shopping center. Hammond, who was affiliated with Financial Services and Norman Tyrone through his partner William Sockle, stated that he had a contact who might be interested in a loan of that size and mentioned Tyrone.

After this conversation, Hammond telephoned Tyrone and wrote to him concerning the Kelleys' loan. Tyrone sent Hammond a loan information form bearing the legend "Financial Services, Ltd. Mortgage Bankers" which was used by Tyrone to evaluate prospective customers. He asked Hammond to have the Kelleys fill out the form.

In November of 1963, the loan form and an additional 11 pages of information on the planned buildings were completed by Ryland Kelley. The data were sent to Tyrone in Atlanta, Georgia, by Hammond.

According to Tyrone, he immediately called Kelley, and discussed a fee for his assistance in procuring a loan. Neither of the Kelleys remember this conversation. Tyrone testified that there had been a specific agreement between him and Triad for a 3 percent fee, while the defendants testified that there had been no such agreement. They insisted that the only agreement was one between them and Hammond for a reasonable fee made at the time of Hammond's first conversation with Ryland Kelley.

Tyrone immediately contacted The Sixty Trust, a lender located in Rhode Island, to interest it in loaning the Kelleys the money they needed. Tyrone learned that a representative of The Sixty Trust, Mr. Cervieri, was in San Francisco on business. He telephoned Cervieri in San Francisco, asking him to visit the Kelleys while he was in California and informing him that he had forwarded Triad's financial data to The Sixty Trust's Rhode Island office.

In December of 1963, Cervieri and the defendants met to discuss financing of the buildings. There is no claim that Cervieri and the defendants would have met without Tyrone's introduction. No agreement was reached between the defendants and The Sixty Trust at this time.

Tyrone, upon learning that there was no agreement for a loan between The Sixty Trust and Triad, sent a letter to Triad suggesting alternative methods of financing. Tyrone also visited the defendants in Palo Alto, discussing their plans and urging them to finance the office building and shopping center separately. His visit was followed by a visit to the defendants by the vice president of Financial Services, who again urged separate financing. The Kelleys found all of the financing methods suggested by Financial Services unsatisfactory.

Both Tyrone and the Kelleys continued to search for a lender who would agree to Triad's terms. In the summer of 1964, after the failure of all attempts to find a lender, the Kelleys reopened negotiations with The Sixty Trust, agreeing to the separate financing initially suggested by The Sixty Trust and by Financial Services.

The Kelleys did not inform Tyrone of the reopened negotiations or of the agreement. Tyrone first learned from Cervieri that negotiations had reopened and later when agreement was near, heard about the negotiations from Sockle and Hammond who had been informed of the negotiations by the Kelleys at the insistence of The Sixty Trust.

In August of 1964, when The Sixty Trust committed itself to lend Triad up to $7,000,000, The Sixty Trust wrote to Triad concerning Triad's payment of fees to Financial Services for introducing it to Triad. The Kelleys then wrote Hammond with respect to the payment of a fee and met with Hammond, offering him $10,000.

Hammond indicated that he had no authority to accept a fee without the approval of Tyrone. He and Tyrone then met with the Kelleys in California to discuss a fee arrangement. No agreement on a fee was reached, and Tyrone filed suit against Triad and all of its general partners.

When the complaint was initially filed on October 5, 1965, the plaintiffs were William Hammond, William Sockle and Financial Services, Ltd., listed as a corporation. The defendants,[2] answered the complaint on July 13, 1966, denying all the material allegations of the complaint and alleging as special defenses that Tyrone was not a licensed real estate broker and thus the action was barred by sections 10130, 10131, and 10136 of the Business and Professions Code, which require all real estate brokers operating in California to be licensed in the State of California, and that Financial Services had not registered as a foreign corporation and thus the action was barred by section 6801 of the Corporations Code, which requires all foreign corporations transacting business in California to register in California.

At the beginning of the trial in February of 1969, over the objections of the defendants, the complaint was amended and Norman Tyrone, doing business as Financial Services, Ltd., was substituted as plaintiff.

On the fourth day of the trial, over the objections of the plaintiff, the

---

[2]William K. and Ryland Kelley, who are named as defendants and who are either officers or partners of all the defendant companies, have represented the defendants in all the proceedings.

defendants moved to amend their answer to raise a third affirmative defense, the failure of Tyrone to file a certificate that he was doing business under a fictitious name pursuant to former section 2466 of the Civil Code.[3] The court reserved ruling on this motion but on the last day of trial, it denied a motion for a nonsuit made by the defendants on this ground, ruling that the plaintiff's failure to file a certificate that he was doing business under a fictitious name was a mere matter of abatement and not a jurisdictional defect.

The court found that defendants had requested Tyrone's services; that the defendants had agreed to pay Tyrone a fee of 3 percent of the loan desired or approximately $200,000, if Tyrone could find a lender, but refused either to acknowledge their debt when Tyrone performed his part of the agreement or to negotiate a fee with him in good faith; that the defendants made no agreement for a fee with Hammond; that neither Tyrone nor Hammond nor Sockle participated in any negotiations between The Sixty Trust and Triad, and, in fact, none of them even knew of the negotiations until the agreement was reached; that none of the plaintiffs were licensed real estate brokers in California and that defendants were not prejudiced by the amendment of the complaint to substitute Norman Tyrone as plaintiff.

The court concluded that there was a contract fully performed by Tyrone for $200,000 or a 3 percent fee; that Tyrone acted as a finder and not a real estate broker and was not required to be licensed; that Tyrone was not required to file a certificate of doing business under a fictitious name; that Tyrone was entitled to a judgment for $200,000; and that neither Hammond nor Sockle was entitled to a judgment.

The trial court's finding that there was a contract between the parties for a 3 percent or $200,000 fee is supported by the evidence and cannot be disturbed on appeal.

Where, as in the instant case, there is conflicting evidence, all doubts shall be resolved in favor of the trial court's decision. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183], 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4237.) The trial court's decision will be overturned only where there is no substantial evidence in support of the trial court's decision and thus there can be no doubt of its erroneous nature. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384]; 6 Witkin, Cal. Procedure, *supra*, § 249, p. 4241.) There was suffi-

[3]Section 2466 has since been repealed. General fictitious name requirements are now found in Business and Professions Code section 17901 et seq.

cient evidence of the agreement, and the court was not required to accept defendants' contrary evidence. Tyrone presented ample evidence of an agreement between him and Triad and it must be assumed that the defendants' contrary evidence was not believed.

Defendants urge that Tyrone is not entitled to a judgment against them on the agreement since he performed the services of a real estate broker in California, but was not licensed as a broker in California. They maintain that his recovery is barred under the provisions of section 10136 of the Business and Professions Code and related sections.[4]

■ Numerous cases have held that one who simply finds and introduces two parties to a real estate transaction need not be licensed as a real estate broker. Such an intermediary or middleman is protected by the finder's exception to the real estate licensing laws, an exception first established in *Shaffer* v. *Beinhorn* (1923) 190 Cal. 569, 573-574 [213 P. 960]. In that case, this court held that a person who contracted to introduce a seller to a prospective purchaser did not act as a broker but as a finder. Many subsequent cases have recognized the exception. (See, e.g., *Batson* v. *Strehlow,* 68 Cal.2d 662, 669 [68 Cal.Rptr. 589, 441 P.2d 101]; *Davis* v. *Chipman,* 210 Cal. 609, 619-620 [293 P. 40]; *Zappas* v. *King Williams Press, Inc.,* 10 Cal.App.3d 768, 772-773 [89 Cal.Rptr. 307]; *Hasekian* v. *Krotz,* 268 Cal.App.2d 311, 319-324 [74 Cal.Rptr. 410]; *Porter* v. *Cirod, Inc.,* 242 Cal.App.2d 761, 762-763 [51 Cal.Rptr. 784]; *Evans* v. *Riverside Internat. Raceway,* 237 Cal.App.2d 666, 675-677 [47 Cal.Rptr. 187]; *Spielberg* v. *Granz,* 185 Cal.App.2d 283, 290-291 [8 Cal.Rptr. 190]; *Palmer* v. *Wahler,* 133 Cal.App.2d 705, 708-711 [285 P.2d 8]; *Freeman* v. *Jergins,* 125 Cal.App.2d 536, 546-551 [271 P.2d 210]; *Crofoot* v. *Spivak,* 113 Cal.App.2d 146, 147-148 [248 P.2d 45]; *Rhode* v. *Bartholomew,* 94 Cal.App.2d 272, 279-282 [210 P.2d 768].)

---

[4]Section 10130 of the Business and Professions Code provides: "It is unlawful for any person to engage in the business, act in the capacity of, advertise or assume to act as a real estate broker or a real estate salesman within this State without first obtaining a real estate license. . . ."

Section 10131 of the code provides: "A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, does or negotiates to do one or more of the following acts for another or others: . . . (d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity."

Section 10136 of the code provides: "No person engaged in the business or acting in the capacity of a real estate broker or a real estate salesman within this State shall bring or maintain any action in the courts of this State for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he was a duly licensed real estate broker or real estate salesman at the time the alleged cause of action arose."

■ The finder is a person whose employment is limited to bringing the parties together so that they may negotiate their own contract, and the distinction between the finder and the broker frequently turns upon whether the intermediary has been invested with authority or duties beyond merely bringing the parties together, usually the authority to participate in negotiations. (See, e.g., *Batson* v. *Strehlow, supra,* 68 Cal.2d 662, 669; *Davis* v. *Chipman, supra,* 210 Cal. 609, 619-620.)

It is urged that even in the absence of any participation in negotiations, the finder's exception is inapplicable where there has been solicitation of a borrower or lender. In this regard, defendants rely upon the 1959 amendment to section 10131 of the Business and Professions Code which changed the definition of a real estate broker to include a person who "solicits" borrowers or lenders.[5]

In one sense of the quoted word all finders must solicit a prospective borrower or lender. Otherwise, the finder would have no function except where a prospective borrower and lender fortuitously call upon him at the same time. To hold that any act of solicitation of a borrower or lender would preclude a determination that a person was a finder would in effect eliminate the finder's exception to the licensing law.

■ It is clear that the Legislature did not intend by the 1959 amendment to section 10131 to eliminate entirely the finder's exception but rather intended to limit it in one respect not relevant here. The 1959 amendment to section 10131 was made by section 4 of chapter 2117 of the 1959 statutes. Section 14 of that chapter makes clear that the purpose of the enactment of the chapter was the licensing of "advance fee" operators who had "sought to shield their activities under the guise of operating as mere finders or locators. . . ." The legislative statement of purpose in the section shows that the Legislature did not intend a departure from established principles relating to brokers and finders except as to the "advance fee" operators, and the reference in the section to "finders" reflects a legislative recognition that the finder's exception to the licensing law was recognized and continued with the exception of the "advance fee" operators.[6]

---

[5]In 1929, the licensing statute was amended to include one who "solicits" for prospective purchasers. (Stats. 1929, ch. 130, § 2, p. 223.)

[6]In chapter 2117, the Legislature stated that it: ". . . finds the necessity for the enactment of the legislation contained . . . in this act to be as follows: 'That since 1948 a number of individuals and corporate entities, hereafter for convenience referred to as promoters, some operating with their principal or main offices in California, have themselves and through their salesmen and agents, engaged in the

Support for this conclusion is furnished by the fact that in cases subsequent to the 1959 and other amendments where no advance fee was involved, the courts have continued to recognize the finder's exception to the licensing law without discussion of the amendments. (E.g., *Batson* v. *Strehlow, supra,* 68 Cal.2d 662, 669; *Zappas* v. *King Williams Press, Inc., supra,* 10 Cal.App.3d 768, 772-773; *Hasekian* v. *Krotz, supra,* 268 Cal. App.2d 311, 319-324; *Porter* v. *Cirod, Inc., supra,* 242 Cal.App.2d 761, 762-763; *Evans* v. *Riverside Internat. Raceway, supra,* 237 Cal.App.2d 666, 675-677.)

■ The cardinal principle of statutory construction is that, absent a

business of appraising the property, making false and fraudulent misrepresentations to the owners, lessees or renters of property, hereafter for convenience referred to as owners, for the purpose of inducing the owners to entrust money to, or to execute agreements to pay money to the promoters to be utilized by the promoters for promised services, such as advertising on a national scale in newspapers, magazines and radio, distribution of brochures, and to establish contact with brokers and to locate and find prospective buyers, in order to promote the sale, lease, rental or exchange of the property of the owners; that said promoters often misrepresent that there will be no charge for their services unless and until the property is sold to a buyer found by them but that an "advance fee," deposit or retainer is required from, or charged against, the owner, all of which will be used to pay the cost of promotional advertising and which will be deducted from the sales commission when the property is eventually sold; that the said promises are made by the promoters with no intent of making a bona fide effort to render such service, and with the intent to render merely token services; and the effectiveness and efficiency of their service is grossly misrepresented by the promoters. [¶] That not all individuals nor corporate entities who receive advance fees engage in the aforesaid practices. Many are long established and legitimate businesses. [¶] Newspapers and magazines of general circulation have not been found to engage in the aforesaid reprehensible practices. [¶] That as a result of the aforesaid practices thousands of owners, both within and outside of California, have been deceived and defrauded by said promoters, and have lost millions of dollars. [¶] *That said promoters have sought to shield their activities under the guise of operating as mere finders* or locators of buyers, or as being engaged exclusively in the advertising or publishing business, and to claim that they are not operating as real estate or business opportunity brokers or salesmen. [¶] To protect the aforesaid owners of property, as well as the general public, and to insure the general welfare, it is necessary to subject the advance fee business to regulation and to limit the persons or entities who engage in the advance fee business to those of proven honesty and integrity, and to establish a fiduciary relationship between the promoters and the owners by requiring that they be licensed as real estate or business opportunity brokers and salesmen, and to require them to account to their principals for the expenditure of the funds entrusted to them. [¶] *Recently persons engaged in the advance fee promotion business have switched to the lending field from the selling field, and have applied the same modus operandi to inducing persons to sign advance fee contracts on the representation that the advance fee operator will aid and assist them to secure loans on their personal or real property, or both. These are often called "advance fee lenders" as distinguished from their prototype, the "advance fee seller." Each is equally in need of regulation and licensing.'* " (Stats. 1959, ch. 2117, § 14, pp. 4942-4943; italics added.)

single meaning of the statute apparent on its face, we must give it an interpretation based upon the legislative intent with which it was passed, and where the Legislature has expressly declared its intent, we must accept the declaration. (*Friends of Mammoth* v. *Board of Supervisors*, 8 Cal.3d 247, 256-257 [104 Cal.Rptr. 761, 502 P.2d 1049].) We are satisfied that it would be improper and contrary to legislative intent to terminate the finder's exception on the basis of amendments to the real estate licensing law which refer to solicitation.

Our determination that the Legislature never intended the finder's exception to be made inapplicable by the finder's mere act of solicitation is given additional support by the provisions of the Business and Professions Code relating to the licensing process. Section 10150.6 of the Business and Professions Code provides that no one may receive a real estate broker's license in California who has not held a real estate salesman's license in California for two years, unless he has had either the equivalent of two years of general real estate practice or graduation from a four-year college or university course which includes specialization in real estate and three members of the real estate commission approve his written petition for an exception to the licensing law. Under sections 10153 and 10153.3 of the Business and Professions Code, all applicants for a broker's license must pass an examination which tests both the applicant's proficiency in English and arithmetic, and his understanding of the principles of real estate and business opportunity conveyancing, the general purposes and general legal effect of agency contracts, deposit receipts, deeds, mortgages, deeds of trust, chattel mortgages, bills of sale, land contracts of sale and leases, the principles of business and land economics and appraisals, the obligations between principal and agent, the principles of real estate and business opportunity practice, the canons of business ethics, and the regulations of the real estate commissioner.

One who merely introduces two parties to a real estate transaction, whether or not he solicits those persons, does not need to be as knowledgeable about real estate transactions as a licensed broker, unless, of course, he participates in the negotiations. The finder of loans is an individual who is familiar with finance and who knows who is available to lend money under what terms and at what time. Unless he enters into the negotiation of the transaction or other activities beyond introduction, he need not be well versed in real estate law or in real estate economics and appraising.

It is true that the finder's exception presents a seeming anomaly in our law. In general, an unlicensed individual may recover an agreed compensation where he merely finds a buyer, seller, lender, or borrower, but if

in addition to finding such person he goes further and helps to conclude the transaction by taking part in negotiating the details of the transaction, compromising or composing differences between the parties, by way of example, he may not recover the agreed compensation.

Nevertheless, when viewed in the light of the competing public policies the finder's exception is not anomalous. Fundamental to our law is the basic principle that persons should perform their contracts, and when they breach their agreements, action should ordinarily lie to enforce contractual duties. On the other hand, the promotion of competency and integrity in those called upon by the public to perform complex duties involving trust is a salutary purpose, and the policy underlying the licensing statutes must be given full effect. Neither considerations of competency nor of trust are of importance where the undertaking is merely to seek out, locate, find and introduce a buyer, seller, borrower, or lender to his counterpart or where negotiations and completion of the transaction are left completely to the principals. By enforcing the promise to pay a finder's fee we give effect to the policy of enforcement of contracts in cases where the policy underlying the licensing statute does not directly apply. It is for the Legislature, not this court, to determine whether the finder's exception should be terminated.

In the instant case, the trial court found that Tyrone did not participate in any negotiations with Triad and The Sixty Trust. It then concluded, based on this finding, that Tyrone was protected by the finder's exception. This finding, and the resultant conclusion, is supported by substantial evidence.

When Tyrone initially introduced defendants to a representative of The Sixty Trust, he did not participate in their negotiations. He did not make an offer or present an offer to either party. When defendants and representatives of The Sixty Trust met the second time to negotiate the loan, Tyrone was not even informed of the negotiations and did not learn of the deal until it had been consummated.

In fact, as defense counsel conceded at trial in his opening statement: "The evidence will show that there was an enormous amount of work required to be done or done in connection with the negotiation of this loan. The work consumed hundreds of hours, hundreds of hours of the time of the Kelleys, hundreds of hours of the time of their attorneys, and resulted in the execution of dozens of documents. Neither Mr. Tyrone nor Mr. Hammond nor Mr. Sockle nor anyone associated with [Financial Services] participated in any way, shape or form in this endeavor.

██ . . . The most that can be said of the services rendered by the plaintiffs —and I don't know which of them will turn out to be the proper person— the most that can be said is that they caused to be brought to the attention of The Sixty Trust the fact that here in California some enterprise under the management of Hare, Brewer & Kelley was in need of funds. That is the beginning and end of services rendered by them."

Although Tyrone's associate helped to prepare a detailed loan form and Tyrone discussed with the Kelleys alternative methods of financing, these services were merely to gain essential information and to better enable him to perform his function of finding a suitable lender. They do not establish as a matter of law that Tyrone participated in the negotiations in the circumstances of this case. So far as appears, the loan form was prepared prior to any contact with The Sixty Trust. The suggestions as to financing were made after negotiations with the Trust had broken down, and they occurred a substantial time prior to the renewal of negotiations between borrower and lender. In view of the complex negotiations which did in fact occur between borrower and lender in the absence of Tyrone, it cannot be concluded as a matter of law that he participated in the negotiations or that he violated the licensing law.

The defendants have asked this court to make findings of fact pursuant to rule 23 of the California Rules of Court which would establish that Tyrone did "solicit" the Kelleys. However, "solicit" as applied in this sense is synonymous with "find," absent participation in negotiations, and, as shown above, such findings would not be determinative.

Moreover, these findings could not properly be made by this court. ██ Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, the authority should be exercised sparingly. (*De Angeles* v. *Roos Bros., Inc.,* 244 Cal.App.2d 434, 443 [52 Cal.Rptr. 783].) Absent exceptional circumstances, no such findings should be made. (*Green* v. *American Cas.* Co., 17 Cal.App.3d 270, 273 [94 Cal.Rptr. 528].) There are no exceptional circumstances in the instant case. The request for findings is denied.

Tyrone's action is not barred by his failure to file a certificate of doing business under a fictitious name pursuant to former Civil Code sections 2466 and 2468.

██ It has been established that "[a]n objection to the maintenance of an action on the ground that plaintiff has not complied with the provisions

of sections 2466 and 2468 of the Civil Code by filing and publishing the certificate required thereby, is a mere matter of abatement pending the trial, which has the result of suspending the trial until the statute is complied with. It is not jurisdictional." (*Kadota Fig Assn.* v. *Case-Swayne Co.,* 73 Cal.App.2d 796, 804-805 [167 P.2d 518]; see also *Rivers* v. *Beadle,* 183 Cal.App.2d 691, 700-702 [7 Cal.Rptr. 170].) ■ Where the plea in abatement on the basis of the fictitious name statute is properly raised prior to trial, the plaintiff may thereafter comply with the statute and then proceed with his action. (*Rudneck* v. *Southern California M. & R. Co.,* 184 Cal. 274, 281 [193 P. 775].)

A judgment on the merits should not be reversed where the plea in abatement is raised for the first time during trial. ■ When the plea in abatement is raised for the first time in the midst of the trial, the policy underlying the fictitious name statute is not the only policy to be considered by the trial judge. The trial judge cannot but be aware that to continue the matter in the midst of trial to permit compliance with the fictitious name statute would result in substantial inconvenience to the parties and the court and might involve a substantial waste of our limited judicial resources. When compliance with the fictitious name statute appears to be a simple matter and when serious disruption of the efficient administration of justice might result from a continuance to permit compliance, the trial judge has discretion to refuse to abate proceedings. In the circumstances, it was not an abuse of discretion for the trial judge to determine that, considering the various policies involved, the trial should continue.

■ Defendants contend that the evidence establishes that Financial Services, Ltd., was a partnership composed of Tyrone and others, and that the judgment must be reversed because of failure to join the other partners as plaintiffs. However, defendants must be deemed to have waived any objection to the nonjoinder. The contention that the commission was owed to a partnership was not raised by answer. The fact that there was a substitution of plaintiffs does not affect the defense because the defense that another party was the obligee, if valid, was available as much against the corporate plaintiff as the individual plaintiff.

In addition, as the trial court concluded, defendants are not prejudiced by Tyrone's failure to join his partners as party plaintiffs. The statute of limitations on bringing suit by Tyrone's unnamed partners has long since run out. There is no threat of a double liability if defendants pay Tyrone. The fact that Tyrone may be obligated to share his fee with his partners or with William Hammond and William Sockle is irrelevant.

Last, the defendants contend that it was error to award a judgment against them as individuals and any judgment should be against Triad, a limited partnership. They urge that the trial court findings are incorrect in stating that each of the five general partners of Triad, individually and as general partners of Triad, requested Tyrone's assistance.

Tyrone was entitled to consider the Kelleys and their various firms as parties to the contract as well as Triad itself. (See Rest.2d Agency (1958) §§ 321, 322.) Moreover, Tyrone is entitled to recover both from Triad and those general partners who were joined as parties to the action. (Code Civ. Proc., § 388; *Fazzi* v. *Peters,* 68 Cal.2d 590, 596-597 [68 Cal.Rptr. 170, 440 P.2d 242].)

The judgment is affirmed.

Appellants' petition for a rehearing was denied April 19, 1973.