Filed 10/24/22 Tran v. GLG Capital CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOANG TRAN et al., | |
| Plaintiffs and Respondents, | G060883 |
| v. | (Super. Ct. No. 30-2018-01017721) |
| GLG CAPITAL CORP., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Tam Nomoto Schumann, Judge. Affirmed.

Fransen and Molinaro and Nathan Fransen for Defendant and Appellant.

Law Offices of Dale Washington and Dale E. Washington for Plaintiffs and Respondents.

\*　　　\*　　　\*

Plaintiffs Hoang Tran, Bac Tran, and Oahn Tran (the Trans) retained defendant GLG Capital Corp. (GLG) on a nonexclusive basis to obtain financing to purchase a shopping center. After the Trans obtained funding and were closing on the sale, GLG demanded a commission. The Trans refused and filed this lawsuit seeking a declaratory judgment that no commission was owed. Following trial, the lower court found in the Trans' favor because an unlicensed GLG agent had been involved in financing negotiations. Judgment was entered in their favor, which GLG now appeals.

We affirm. The trial court's findings are supported by the record and existing authority.

I

FACTS

GLG arranges financing for commercial real estate transactions. Nonparty Gregory Gantman, a licensed real estate broker, was the sole officer and shareholder of GLG during the relevant time period. In February 2018, GLG and the Trans entered into a nonexclusive agreement (the agreement), in which GLG agreed to help the Trans obtain financing to purchase a shopping center. The agreement provided that GLG would arrange financing "at [the] best rates, terms, and fees. Otherwise [the Trans could] go with any other funding sources." But it also specified that the Trans "may not attempt, on [their] own or through representatives, to raise capital or secure indebtedness from persons introduced by [GLG]" without paying GLG a commission.

Per the agreement, GLG introduced the Trans to Fidelity Bancorp Funding Inc. and Sterk Investments (Fidelity/Sterk). While the financing terms GLG negotiated with Fidelity/Sterk were the best terms offered to the Trans, they chose a different financing option. However, GLG claimed the financing obtained by the Trans resulted from their introduction to Fidelity/Sterk. The specifics of GLG's theory are not

2

explained by the parties.[1]  Regardless, once the Trans entered escrow for the shopping center sale, GLG demanded a $161,250 commission per the agreement.

The Trans filed this lawsuit against GLG in September 2018, asserting two causes of action.  First, they sought a judicial declaration that GLG was not owed a commission.  Second, they alleged GLG intentionally interfered with their loan agreements by demanding its commission from escrow.  GLG filed a cross-complaint against the Trans, alleging claims for breach of the agreement, quantum meruit, and declaratory relief.

The case went to trial in summer of 2021.  At trial, plaintiffs asserted an unlicensed associate of GLG, John DeHart, was involved in financing negotiations with Fidelity/Sterk.  Because DeHart engaged in actions that require a broker's license, the Trans claimed GLG was not owed a commission.  In response, GLG argued it only introduced the Trans and Fidelity/Sterk, which does not require a license.

Following trial, the court entered judgment in favor of the Trans.  It awarded them $39,779.13 in damages and found GLG was not entitled to a commission.  While the court did not issue a statement of decision, it attached several findings of fact and law to the judgment.  Among other things, it found DeHart was an agent of GLG and unlicensed.  It also found Gantman and DeHart "did more than just introduce [the Trans] to [Fidelity/Sterk] as they were both actively involved in funding negotiations."  In support of its denial of the commission, the court cited *Tyrone v. Kelley* (1973) 9 Cal.3d 1 and *Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441 (*Preach*).

_____

[1]  It appears that after GLG introduced the two parties, the Trans allegedly negotiated a different financing scheme with Fidelity/Sterk without GLG's involvement.  The Trans and their extended family members allegedly obtained 11 loans from Fidelity/Sterk on 11 different properties and used the proceeds from those loans as a down payment for the shopping center.

GLG appeals the judgment, arguing *Preach* does not bar it from obtaining a commission.   We disagree.


II

DISCUSSION

*A. GLG's Commission*

We review the trial court's findings of fact under the substantial evidence standard and its legal conclusions de novo.  (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.)  "The trial court's ruling is presumed to be correct on appeal, and the burden is on the appellant to affirmatively show error."  (*Starcevic v. Pentech Financial Services, Inc.* (2021) 66 Cal.App.5th 365, 374.)  Since there is no statement of decision, the doctrine of implied findings requires us to "presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record.  In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence."  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 (*Shaw*).)

"A real estate broker . . . is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: . . . [¶] (d) Solicits borrowers or lenders for or *negotiates loans* or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured

directly or collaterally by liens on real property or on a business opportunity." (Bus. & Prof. Code, § 10131, subd. (d), italics added.)[2]

"It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker . . . within this state without first obtaining a real estate license from the department . . . ." (§ 10130.) "No person engaged in the business or acting in the capacity of a real estate broker . . . within this state shall bring or maintain any action in the courts of this state for the collection of compensation for the performance of any of the acts mentioned in this article without alleging and proving that he or she was a duly licensed real estate broker or . . . at the time the alleged cause of action arose." (§ 10136.)

"The purpose of the licensing requirements is to protect the public from incompetent or untrustworthy practitioners. [Citation.] To that end, all real estate brokers in California must be licensed." (*Akopyan v. Wells Fargo Home Mortgage, Inc.* (2013) 215 Cal.App.4th 120, 131.) To further this goal, sections 10130 et seq. "prohibit an unlicensed real estate broker from collecting compensation earned in the capacity of a broker." (See *Salazar v. Interland, Inc.* (2007) 152 Cal.App.4th 1031, 1036.) Further, "a real estate broker may not employ or compensate, directly or indirectly, an unlicensed person to perform acts for which a license is required . . . ." (*Preach*, *supra*, 12 Cal.App.4th at p. 1452; § 10137.) The public policy behind the licensing requirement is so strong that "[i]t is a misdemeanor . . . for any person . . . to pay or deliver to anyone a compensation for performing any [act requiring a license], who is not known to be or who does not present evidence to such payor that he is a regularly licensed real estate broker at the time such compensation is earned." (§ 10138.)

---

[2] All further undesignated statutory references are to the Business and Professions Code. We also note that section 10133.2 clarifies that section 10131 "do[es] not apply to any stenographer, bookkeeper, receptionist, telephone operator, or other clerical help in carrying out their functions as such."

As GLG argued in the trial court, there is a "finder['s] exception" to the licensing requirement. "[O]ne who simply finds and introduces two parties to a real estate transaction need not be licensed as a real estate broker. Such an intermediary or middleman is protected by the finder's exception to the real estate licensing laws." (*Tyrone v. Kelley*, *supra*, 9 Cal.3d at p. 8.) "The line between brokers and finders is based on whether the person in question has engaged in any negotiating to consummate the transaction. . . . 'If the broker takes any part in the negotiations, no matter how slight, he is not a middleman but a broker.'" (*Preach*, *supra*, 12 Cal.App.4th at p. 1452.)

GLG does not argue for application of the finder's exception on appeal. Further, the trial court found DeHart was involved in funding negotiations, which requires a license. (§§ 10131, subd. (d), 10130, 10136.) This factual finding must be affirmed if it is supported by substantial evidence. (*ASP Properties Group, L.P. v. Fard, Inc.*, *supra*, 133 Cal.App.4th at p. 1266.) The record submitted by GLG does not allow us to assess this finding. It does not contain any of the evidence submitted at trial, nor does it include a trial transcript. GLG's failure to provide an adequate record on this issue "requires that the issue be resolved against [GLG]." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 (*Hernandez*).)

On appeal, GLG argues the trial court erred by relying on *Preach*. Rather, it maintains this case and *Preach* involve different facts, which require different outcomes. While there are distinctions between the cases, *Preach*'s reasoning applies here and precludes GLG from receiving a commission.[3]

In *Preach*, the plaintiff was a licensed real estate broker. He agreed to procure a tenant for the defendants' real property in exchange for a broker's commission.

---

[3] GLG does not contend *Preach* was incorrectly decided. We also note that neither side argued whether GLG was entitled to a commission under the agreement. Even it were, however, the Trans promise to pay the commission was unenforceable, which we explain below.

(*Preach*, *supra*, 12 Cal.App.4th at p. 1446.) Nonparty Ralph Singer (Singer) informed the plaintiff that a business, Home Club, was looking to lease property. (*Id.* at pp. 1446-1447.) Though Singer was not a licensed broker, he had access to many high-ranking people at Home Club. So, the plaintiff offered to pay Singer a third of his commission if Home Club leased the defendants' property. (*Ibid.*) Singer engaged in various activities requiring a broker's license, including lease negotiations. (*Id*. at pp. 1448-1449, 1451.) The defendants and Home Club eventually entered into a lease, but the defendants refused to pay the bulk of the plaintiff's commission, causing him to file suit. (*Id*. at pp. 1446, 1449.) The trial court later entered summary judgment against the plaintiff. It found the defendants' "promise to pay [the] plaintiff a broker's commission was unenforceable because [the] plaintiff's right of compensation was based on activities unlawfully performed by Singer." (*Id*. at p. 1454.)

On appeal, the plaintiff argued his agreement with Singer was completely separate from his agreement with the defendants. Thus, even if Singer performed acts requiring a license, that should not affect the defendants' promise to pay him a commission. (*Preach*, *supra*, 12 Cal.App.4th at p. 1455.) The appellate court disagreed. It explained, the "[p]laintiff cannot insulate his agreement with [the] defendants from the Business and Professions Code's proscription against brokers sharing their commissions with unlicensed persons who perform acts for which a license is required by the artifice of making one agreement with Singer and another with defendants. There would be no deterrent to a real estate broker employing unlicensed persons if the only consequence was that the unlicensed person would not be paid by the broker but the broker would receive his or her full fee." (*Ibid.*) It continued, "[t]he purpose of the real estate licensing statutes is to protect the public from the perils incident to dealing with incompetent or untrustworthy real estate practitioners. [Citations.] This purpose would not be served by adopting the theory of [the] plaintiff . . . that regardless of the unenforceability of his contract with Singer, [the] plaintiff's contract with defendants was unaffected." (*Ibid.*)

7

The appellate court then explained that, denying the plaintiff a commission was proper under three scenarios, but each of them involved issues of fact that could not be resolved at summary judgment. First, it was unclear whether the plaintiff had helped the defendants obtain the lease. (*Preach*, *supra*, 12 Cal.App.4th at pp. 1454-1455.) If he had not, "then his commission [would] be denied for failure of consideration." (*Id.* p. 1457.) Second, there were issues of fact as to whether the plaintiff and Singer were engaged in a joint venture. If so, "knowledge of Singer's unlawful activities would be imputed to [the] plaintiff. Under such circumstances [the] plaintiff would be unable to enforce [the] defendants' promise to pay him a commission." (*Id.* at pp. 1457-1458.) Third, "if [the] defendants [were] unable to establish the existence of a joint venture, but [were] able to persuade the trier of fact that [the] plaintiff knew of Singer's unlawful activities, [the] defendants' agreement to pay [the] plaintiff a commission would be unenforceable for the reasons stated" (i.e., the analysis set forth in the preceding paragraph of this opinion). (*Ibid.*)

This case implicates the third scenario. If GLG knew DeHart was unlicensed and negotiating finance terms, then the Trans' agreement to pay GLG a commission is unenforceable for the policy reasons above. The record does not show whether the trial court made such a finding. But we must infer it did under the doctrine of implied findings. (*Shaw*, *supra*, 170 Cal.App.4th at p. 267.) And given the inadequacy of the record, we must conclude this finding is supported by substantial evidence. (*Hernandez*, *supra*, 78 Cal.App.4th at p. 502.)

GLG argues, unlike *Preach*, there is no evidence it agreed to give any portion of the commission to DeHart. Again, the doctrine of implied findings and the incomplete record resolve this issue against GLG. (*Shaw*, *supra*, 170 Cal.App.4th at p. 267; *Hernandez*, *supra*, 78 Cal.App.4th at p. 502.)

Finally, GLG contends that under *Preach*, a licensed broker only forfeits its commission when it is in a partnership or joint venture with the unlicensed actor, which is

8

not the case here (the court found DeHart was GLG's agent). But *Preach*'s holding was not so limited. As set forth above, *Preach* held that in the absence of a joint venture, a licensed broker's commission is unenforceable if it *knew* the unlicensed broker was performing work requiring a license. (*Preach*, *supra*, 12 Cal.App.4th at pp. 1457-1458.) This holding stems from *Preach*'s observation that knowingly retaining an unlicensed person to perform such work violates the public policy behind licensing: protecting the public from incompetent practitioners. To discourage this practice, a licensed broker cannot receive any portion of its commission if it knows an unlicensed employee is performing work requiring a license. (*Id*. at pp. 1455, 1457-1458.) Because GLG knew DeHart was unlicensed and engaged in financing negotiations, it is precluded from receiving any commission.

*B. Sanctions*

The Trans request we sanction GLG for filing a frivolous appeal. They assert the appeal is frivolous because (1) GLG's arguments completely lack merit, and (2) GLG failed to provide an adequate record. We deny the request.

"[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650.) Courts must "avoid a serious chilling effect on the assertion of litigants' rights on appeal. Counsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal. An appeal that is simply without merit is *not* by definition frivolous and should not incur sanctions. Counsel should not be deterred from filing such appeals out of a fear of reprisals." (*Ibid*.)

9

While we are unpersuaded by GLG's arguments, they are not so preposterous as to warrant sanctions. And though the record was far from complete, it was sufficient to understand the contours of the trial court's judgment and the facts animating this lawsuit. We also made several factual findings in favor of the Trans due to the incomplete record. This is a sufficient penalty, and further sanctions are unnecessary.

*C. The Trans' Request for Relief*

The Trans briefly note the trial court denied their request to hold Gantman jointly and severally liable for the judgment on an alter ego theory. We deny their request to reverse this ruling. "'As a general matter, "'a respondent who has not appealed from the judgment may not urge error on appeal.'" [Citation.] "To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants."'" (*Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665.) The Trans have not done so. Nor have they argued any exception to this rule.

III

DISPOSITION

The judgment is affirmed. The Trans are entitled to their costs on appeal.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.

10