[No. E022786. Fourth Dist., Div. Two. Mar. 13, 2000.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Plaintiff and Appellant, v. GIANT INLAND EMPIRE R.V. CENTER, INC., Defendant and Appellant; COUNTY OF SAN BERNARDINO, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

1268

**COUNSEL**

Frandzel Share Robins Kaplan & Bloom and Thomas M. Robins III; Linda B. Reed and Ullar Vitsut for Plaintiff and Appellant.

Kasdan, Simonds, McIntyre, Epstein & Martin and R. Donald McIntyre for Defendant and Appellant.

Alan K. Marks, County Counsel, and Dawn Stafford, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**WARD, J.**—Plaintiff and appellant Bank of America (Bank) appeals from a judgment in favor of defendant and respondent County of San Bernardino (County) and defendant and appellant Giant Inland Empire R.V. Center, Inc. (Giant), in an action by Bank to set aside a tax sale by County to Giant of real property on which Bank had a secured lien.[1] Giant appeals from the postjudgment denial of its motion for attorney fees pursuant to Code of Civil Procedure section 1021.1.

We reverse the trial court's judgment because County failed to give reasonable notice of the tax sale to Bank. Accordingly, Giant's appeal regarding attorney fees becomes moot as Giant is no longer the prevailing party.[2]

### FACTS AND PROCEDURAL HISTORY

Leon D. and Patricia Peskin owned the subject real property (Property). In 1987, Bank made a loan to the Peskins secured by a trust deed on the Property (Trust Deed). On July 22, 1987, Bank recorded the Trust Deed.

The Trust Deed listed the following address for Bank:

> "Bank of America NT & SA
> "P.O. Box 7127
> "Pasadena, Ca 91101
> "Lender
> "Attn: Jim Davis, AVP"

Paragraph 10 of the Trust Deed stated that notices to Bank shall be given to Bank at the above provided address, and that "[a]ny notice to [Bank] shall be given by first class mail to [Bank's] address stated herein or any other address [Bank] designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to . . . [Bank] when given as provided in this paragraph."

---

[1]Giant and County will sometimes be referred to as "defendants" for convenience.

[2]On January 4, 1999, Giant filed a request for additional findings of fact. Because Giant failed to provide exceptional circumstances to justify making new findings on this appeal, we deny Giant's request. (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 13 [106 Cal.Rptr. 761, 507 P.2d 65].) Moreover, on June 18, 1999, Giant asked that we take judicial notice of documents related to Code of Civil Procedure section 1021.1. Because Giant's cross-appeal is moot, we deny its request for judicial notice. Furthermore, on February 1, 2000, Giant submitted an application for an order to allow acceptance of memorandum of out-of-state authorities on issues identified by the tentative opinion. Giant's application was denied at oral argument on February 2, 2000.

Paragraph 16 of the Trust Deed also stated that notices of foreclosures of liens with priority over the Trust Deed shall be sent to Bank at the same address provided above.

On September 16, 1988, Bank closed the post office box listed on the Trust Deed. Bank did not record a new address for giving notices regarding the Trust Deed.

On August 6, 1992, Bank did, however, record a notice of default and election to sell (Default Notice) directed to the Peskins, advising them that the Property was in foreclosure and in danger of being sold to pay the Peskins' indebtedness to Bank. The Default Notice stated that if the Peskins wanted to inquire as to the amount they must pay to stop the foreclosure, they should contact Bank at "555 So. Flower Street, 9th Flr., Los Angeles, California 90071, (213) 228-2990 or (213) 228-2988." The Default Notice also indicated that the Peskins were delinquent in tax payments "in the approximate amount of $154,488.00 . . . ." Accordingly, at the time the Default Notice was recorded, Bank was aware of substantial tax defaults with respect to the Property.

Around November of 1993, County began efforts to obtain Bank's last known address. County ordered and obtained (1) a lot book report which also included a judgment and tax lien guaranty (lot book report), and (2) copies of the instruments identified in the lot book report. The lot book report identified the Trust Deed but not the Default Notice. Accordingly, County identified the Pasadena post office box on the Trust Deed as Bank's last known address.

Around February of 1994, County initiated proceedings to sell the Property for nonpayment of property taxes pursuant to Revenue and Taxation Code section 3691.[3] County gave notice of the tax sale to Bank and other parties of interest as follows: (1) County posted notice of the sale on the Property on March 15, 1994; (2) County published notice of the tax sale for three successive weeks in a newspaper of general circulation; and (3) County mailed the notice of the tax sale to Bank at the post office box address provided on the Trust Deed, via certified mail, on February 5, 1994. The post office processed the notice on February 9, 1994, and returned the notice to County as undeliverable. County received the return notice.

At the tax sale on March 28, 1994, the Property was sold by County to Giant, the highest bidder, for $280,000. Just one day later, Bank discovered

---

[3]All statutory references are to the Revenue and Taxation Code unless otherwise specified.

that the sale had occurred. The following day, Bank notified County, claiming it had not received notice of the sale.

On April 5, 1994, Bank filed a complaint to invalidate the tax sale of the Property to Giant, naming County, and served County with the complaint on April 5, 1994. Bank did not amend its complaint to name substitute Giant as "Doe 1" until six months later, November 7, 1994.

Thereafter, on April 28, 1997, the trial court granted Giant's motion, joined by County, to bifurcate the trial to address the issue of (1) whether Bank was entitled to set aside the tax sale, before the issue of (2) whether Bank was estopped from invalidating the sale.

On February 25, 1998, trial commenced on the first issue. After three days of testimony, the case was submitted on March 3, 1998. On March 9, 1998, the trial court announced its oral statement of decision in favor of County and Giant, and issued its written statement of decision on March 19, 1998.

In its statement of decision, the trial court found that Bank was not entitled to receive actual notice of the tax sale under section 3701, but rather, that County must give notice reasonably calculated to give actual notice, and in this case, County's efforts "were reasonably calculated to give notice." Accordingly, the trial court entered judgment in favor of defendants and trial on the second issue was not necessary.

Bank appeals.[4]

## ANALYSIS

### I. *County Failed to Make a Reasonable Effort to Obtain Bank's Last Known Mailing Address*

 Bank contends that its due process rights under the Fourteenth Amendment were violated because County failed to make a reasonable effort to obtain Bank's last known mailing address.

Both the United States Constitution and California Revenue and Taxation Code require that a tax collector make a reasonable effort to put interested parties on notice regarding an impending tax sale.

---

[4]County filed a notice of joinder on April 12, 1999, joining in Giant's brief filed on April 2, 1999.

Under section 3701,[5] a tax collector is required to "make a reasonable effort to obtain the name and last known mailing address of parties [in] interest," but the "validity of any sale . . . shall not be affected . . . if a party of interest does not receive the mailed notice."

 The United States Supreme Court has "recognized that prior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a State must provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (*Mennonite Board of Missions v. Adams* (1983) 462 U.S. 791, 795 [103 S.Ct. 2706, 2709, 77 L.Ed.2d 180, 185] (hereafter *Mennonite*), citing *Mullane v. Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [70 S.Ct. 652, 656-657, 94 L.Ed. 865] (hereafter *Mullane*).)

Although actual notice is not required, " '[t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. . . .' [Citation.]" (*Sinclair & Valentine Co. v. County of Los Angeles* (1988) 201 Cal.App.3d 1021, 1027 [247 Cal.Rptr. 568] (hereafter *Sinclair*).)

 In this case, there is no dispute that (1) County ordered a lot book report and documents identified in the lot book report to obtain Bank's last known mailing address, (2) the lot book report revealed Bank's post office address, as provided in the Trust Deed, (3) County mailed its notice regarding the tax sale to Bank's post office address, (4) Bank had closed its post office box, (5) Bank did not record a change of address, (6) Bank did not notify County regarding its change of address, (7) Bank did record a Default Notice, (8) the lot book report did not refer to the Default Notice, and (9) Bank did not receive the tax sale notice.

---

[5]Section 3701 states as follows:

"Not less than 45 days nor more than 120 days before the proposed sale, the tax collector shall send notice of the proposed sale by certified mail with return receipt requested to the last known mailing address, if available, of parties of interest, as defined in Section 4675. The notice shall state the date, time, and place of the proposed sale, the amount required to redeem the property, and the fact that the property may be redeemed up to the close of business on the last business day prior to the date of sale, and information regarding the rights of parties of interest to claim excess proceeds, as defined in Section 4674, if the property is sold and excess proceeds result from that sale.

"The tax collector shall make a reasonable effort to obtain the name and last known mailing address of parties of interest.

"The validity of any sale under this chapter shall not be affected if the tax collector's reasonable effort fails to disclose the name and last known mailing address of parties of interest or if a party of interest does not receive the mailed notice."

When facts are undisputed, the appellate court is confronted with a question of law and is not bound by the findings of the trial court. (*Mole-Richardson Co. v. Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894 [269 Cal.Rptr. 662].) Questions of law are reviewed de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].)

Because there are no disputed facts in this case, we must independently determine whether County's practice of relying solely on a lot book report to obtain Bank's last known mailing address comports with the requirements under section 3701 and the due process clause of the United States Constitution.

Before we can make this determination, we must first examine what a lot book report entails. According to Bank's expert witness, Professor John Hetland, a lot book report represents "a snapshot of raw data that appears in the files of the particular branch of the title company."[6] A lot book report would reveal "the owner, the last conveyance after fee, and any liens that appear to be outstanding," but would not reveal "anything having to do with the official index, the grantor/grantee index, or anything that tracks the names of any parties." Hence, even if the lot book report reveals a recorded lien on a trust deed, it would not reveal any subsequent documents recorded with respect to that lien, except for a reconveyance.

Professor Hetland testified that ordering a lot book report would not be a reasonable method to use to obtain a lienholder's last known address: "It is simply ineffective and often misleading. . . . [¶] [b]ecause you are not going to get the information you are looking for. It does not purport to give anything about names or addresses other than seeing the name that appears on the original document and that name commonly is the place where the document is returned by the recorder. [¶] And what you are after is the current name and address of people with an interest, not something that shows up on the original documents, often several years earlier." Professor Hetland testified that a preliminary title report, at a minimum, should be obtained because it would provide documents recorded subsequent to the original document creating the lien.

Professor Hetland's testimony was consistent with the State Controller's Manual in effect at the time of the sale. In a chapter entitled, Parties of Interest Search, the State Controller's Office warned tax collectors against the use of lot book reports: "Be careful when ordering a report from a title company. The type of report that is ordered is very important. 'Lot book,'

---

[6]Neither County nor Giant presented evidence to refute Professor Hetland's testimony.

. . . reports will only provide a portion of the needed information. The only report which will provide complete information is a 'Preliminary' report."

Moreover, County's own "custom and practice in 1994 for ascertaining the correct address for those persons entitled to receive notice of a tax sale of real property" was to obtain addresses "from the assessment roll for the subject property and from documents recorded against the subject property in the public records."

Hence, it is apparent that County was fully aware that lot book reports provided limited information for obtaining the last known addresses of interested parties. Had County ordered a preliminary title report or followed its custom and practice by reviewing documents recorded against the Property, County would have discovered the Default Notice containing Bank's current address.[7]

Nevertheless, defendants claim that County gave proper notice by mailing the notice of tax sale to the address listed on the Trust Deed: "County had every reason to believe [the post office box address] was the address to which Bank wanted notices [to be sent] regarding the Trust Deed." (Underscoring in original.) Defendants' argument fails because County's reliance on the lot book report—which showed only the Trust Deed and *no other documents recorded subsequent to the recording of the Trust Deed*—was not reasonable. How could County have known that the address on the Trust Deed was the last known mailing address when its procedures utilized to assess the last known address would not reveal any other documents recorded with regard to that Trust Deed—not even a recorded change of address—except for a reconveyance?

Moreover, section 3701 requires that County "make a reasonable effort to obtain the name and *last known mailing address* of parties of interest." (Italics added.) The last known mailing address for Bank was provided in the Default Notice, regardless to whom the Default Notice was addressed. In fact, the Trust Deed stated that notices to Bank shall be given to the address stated in the Trust Deed, "or any other address [Bank] designates *by notice to Borrower.*" In the Default Notice, Bank designated a new address for the Peskins, the borrowers, which the County should have utilized.

In conclusion, we hold that the County's sole reliance on a lot book report, which would not provide notice of documents recorded after the creation of

---

[7]County admitted that if they revealed more than one address for a party in interest, it would have mailed the notice of tax sale to each address.

a lien, does not constitute a reasonable effort to obtain the "last known mailing address of parties of interest" under section 3701. Hence, notice provided to addressees based solely on information obtained from a lot book report is not " 'notice reasonably calculated, under all circumstances, to apprise interested parties' " of the tax sale. (*Mennonite, supra,* 462 U.S. 791, 795 [103 S.Ct. 2706, 2709, 77 L.Ed.2d 180, 185].).

## II. *Bank's Due Process Rights Were Violated When County Did Not Re-Notice the Tax Sale Once County Was Aware Bank Did Not Receive Notice of Tax Sale*

Even if County's efforts to obtain Bank's last known mailing address by obtaining a lot book report were deemed reasonable, County still violated Bank's due process rights when it failed to resend notice to Bank, after its initial notice of tax sale was returned to County before the tax sale.[8]

There is no dispute that County's tax sale notice was returned to County by the post office, indicating it was undeliverable. Once County became aware that the notice was undeliverable, it then knew that Bank did not receive notice of the scheduled tax sale. At that time, it should have made reasonable efforts to renotice Bank regarding the tax sale. The parties dispute whether the notice of tax sale was returned *before* or *after* the tax sale.

We apply two standards of review, substantial evidence and independent review, to different aspects of the case. (See generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1995) ¶ 8.32 et seq.) First, we review the trial court's determination of questions of law independently. "The proper interpretation of statutory language is a question of law which this court reviews de novo, independent of the trial court's ruling or reasoning. [Citations.]" (*Plunkett v. Spaulding* (1997) 52 Cal.App.4th 114, 126 [60 Cal.Rptr.2d 377], overruled on other grounds in *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 40 [91 Cal.Rptr.2d 293, 989 P.2d 720].) Second, the trial court's factual finding, i.e., that it could not be determined when County's notice to Bank was returned to County, is reviewed under the substantial evidence standard. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial

---

[8]Professor Hetland testified that, if a tax collector were to use a lot book report and everyone received notice, the County's efforts might be deemed proper. However, "if that notice starts coming back, then you surely have to do more."

evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 [197 Cal.Rptr. 925], original italics.)

In *Sinclair*, Frye Industries, Inc. (Frye) conveyed to the plaintiff, by grant deed, two parcels of unimproved real property in the City of Santa Fe Springs, County of Los Angeles. (*Sinclair, supra,* 201 Cal.App.3d 1021, 1024.) The County of Los Angeles, however, assigned the two parcels three separate tax identification numbers for purposes of assessing real property taxes, i.e., one parcel carried two identification numbers (parcel one) and the other carried one identification number (parcel two). (*Ibid.*)

One year later, the plaintiff relocated its principal offices from New York to Ohio. The secured tax rolls relating to the first parcel were updated to reflect this and subsequent changes in the plaintiff's address, as well as the fact that Frye was no longer the record owner of the property. However, the secured tax rolls relating to parcel two, the subject of the litigation on appeal, were not updated. (*Sinclair, supra,* 201 Cal.App.3d at p. 1024.) Thereafter, the assessments on parcel two were mailed to Frye, in care of the plaintiff, at the New York address previously shared by both companies. For 30 months, the bills were forwarded to and paid by the plaintiff. But, once the post office ceased providing this service, the bills were returned to the County of Los Angeles, marked "undeliverable." The tax bills on parcel one, however, were mailed to the various updated addresses and duly paid. (*Sinclair, supra,* 201 Cal.App.3d at p. 1025.) When the County of Los Angeles did not receive the tax assessments for parcel two, it set the parcel for tax auction. (*Ibid.*) The County of Los Angeles "purported to inform both Frye Industries and plaintiff of the proposed sale by sending notices thereof to the same New York address it had futilely utilized previously. As a consequence, and quite anticipatably, these documents were also returned undelivered." (*Ibid.*) The court noted that the County of Los Angeles made no further effort to determine the plaintiff's correct address, "either by simply checking the tax collector's own name index, or by referring to a local telephone directory for the Santa Fe Springs area . . . ." (*Ibid.*) The court noted that "[i]t has long been recognized that 'when notice is a person's due, process which is a mere gesture is not due process. . . .'" (201 Cal.App.3d at p. 1027, quoting *Mullane, supra,* 339 U.S. 306, 315 [70 S.Ct. 652, 657].) Based on these facts, the court stated "we can but uphold the trial court's determination, which, as noted, the County does not contest, that the County's failure, under the circumstances here present, to undertake the relatively modest administrative burden required to discover plaintiff's whereabouts before proceeding with a sale which would irrevocably extinguish its legally protected property interest constituted a violation both of

California statutory law and the due process clause of the Fourteenth Amendment." (*Sinclair, supra,* 201 Cal.App.3d at p. 1027.)

■ Analogously, once County here was aware that Bank did not receive notice of the tax sale—i.e., if it received the notice of tax sale back indicating that it was not delivered, prior to the tax sale—County should have realized the notice it sent was a "mere gesture," and not due process, and County should have "[undertaken] the relatively modest administrative burden required to discover plaintiff's whereabouts before proceeding with a sale which would irrevocably extinguish its legally protected property interest." (*Sinclair, supra,* 201 Cal.App.3d at p. 1027.) Accordingly, the key issue is whether County received the returned notice prior to conducting the tax sale on the Property.

The trial court, in its statement of decision, agreed, and stated that "[i]f the county received the return of the undelivered notice before the sale, it would have been obligated to look further using, for example, a preliminary title report, assessor's rolls, telephone book, etc., for a later address to which notice should be directed." The trial court, however, found that the "evidence fails to establish that the county had timely notice of a bad address for plaintiff." We hold that there is insufficient evidence to support the trial court's finding, and instead, the evidence supports a finding that County received the returned notice prior to the tax sale.

In this case, County conceded it had actually received the returned notice but could not definitively say *when* it had done so. The presumption under the circumstances was that it had "been received in the ordinary course of mail."[9] (Evid. Code, § 641.)[10] County presented no evidence to rebut this presumption.

The evidence presented during trial showed: County mailed, via certified mail, a notice of tax sale to Bank on February 5, 1994. On February 9, 1994, the envelope containing the notice of tax sale was marked by the Pasadena post office, "Return to sender, forward order expired, unable to forward," and returned to San Bernardino. Although County admitted receiving the

---

[9]County argues that Evidence Code section 641 is not applicable because there is no evidence that the letter was properly addressed or mailed. The notice, however, was returned, as directed by the return receipt that was filled out by County. County does not argue its own address, provided on the return receipt, was incorrect. Moreover, although County argues that there is no proof that the returned notice was properly mailed, the evidence supports a finding that the returned notice was properly mailed by the post office in Pasadena.

[10]Evidence Code section 641 states "[a] letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail."

returned notice from the post office, no one from County could remember when it was returned. Hence, County argues that the returned notice could have been received after the tax sale on March 28—nearly seven weeks after the Pasadena post office stamped the notice as undeliverable and returned it to San Bernardino.

Contrary to County's assertion, uncontroverted testimony from post office employees indicated that the usual time for an undeliverable letter to be returned from Pasadena to San Bernardino ranges from one to three days. Once it reached San Bernardino, the post office employee from San Bernardino testified that it should have taken two to three days to deliver the returned mail. The trial court, however, stated that "[t]his testimony was undermined by the admission that it *could* take much longer." (Italics added.) There is no evidence to support this finding.

The trial court reached this finding because "[t]he realities of letter delivery are such that a machinery malfunction, misplacement of the returned notice, ineffectual efforts of postal workers, etc., *could have* worked to delay the return of this particular notice for an unknown period of time." (Italics added.) These findings are based on the testimony of postal workers who testified that it is "possible" for mail to take 14 years to arrive, mistakes do happen, mail is misplaced, and that there are "a number of things that *might* prevent the mail from being delivered as quickly as the process" described, such as mail getting jammed in a sorting machine. (Italics added.) Both postal employees, however, agreed that it was unlikely the tax notice got jammed in a machine because there was no evidence of damage to the envelope. There was no evidence of any other irregularity, either, inasmuch as County actually did receive the returned notice.

These statements, which the trial court relied upon, only stated all the "possible" things that might happen. ■ However, " ' " '[a] finding of fact must be an inference drawn from evidence rather than on a mere speculation as to the probabilities without evidence. A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities.' [Citation.]" ' " (*Krause v. Apodaca* (1960) 186 Cal.App.2d 413, 418 [9 Cal.Rptr. 10].)

■ Furthermore, we note that Bank informed County that it had not received notice about the tax sale just two days after the sale had occurred. Thus, County was fully aware that Bank had not received notice of the sale immediately after the tax sale occurred. Accordingly, it is a fair inference that, had County received the returned notice only after the tax sale and after

Bank's assertion that County failed to provide notice of the sale, County employees would have remembered that fact. (*Cowan v. Tremble* (1931) 111 Cal.App. 458, 465 [296 P. 91] [when an addressee testified he was unable to remember the date of receiving a letter, the court held that it was a fair inference, that had the letter been received after the critical period mentioned, "he would have remembered the fact"].)

Defendants rely on the testimony of County's tax sales supervisor. The supervisor testified that it was the custom and practice of County to resend notices of tax sales if they were returned before the tax sale. Here, no new notice was sent; therefore, defendants urge that we can infer that County must have received the returned notice after the sale. The tax sales supervisor's testimony, however, does not actually support defendants' claim.

Although the supervisor testified to County's general custom and practice, she also stated that if a notice was sent to a *lienholder*, such as Bank, and not the taxpayer, and there was no forwarding address on the returned envelope, *no further efforts would be made to locate the lienholder*. It is also interesting to note that in County's responses to special interrogatories, County stated that if a notice of tax sale is returned as undeliverable before the tax sale has occurred, and if the notice had been sent to the correct address, as County argues in this case, "the practice of the Tax Collector is *to attempt* to find another address and resend the notice *if possible*, but not to cancel the sale." (Italics added.) County's evidence did not unequivocally establish a likelihood it would have sent a new notice if it had received the returned initial notice to Bank. According to County's own evidence, in fact, it is fair to infer that, because Bank is a lienholder, not the taxpayer, County would not have made any further efforts to resend the notice of tax sale after the initial notice was returned.

Moreover, County's own employees could not state when the returned notice was returned. County contributed to this state of affairs, as County employees testified they did not date stamp the returned notice of tax sale, and did not keep a log of when County received returned notices of tax sales. No one at County in fact knew when the notice it sent to Bank was returned to County. Ultimately, there was no evidence to rebut the presumption that County received the returned notice in the ordinary course of mail.

From the uncontroverted testimony and the undisputed fact that the post office returned and County actually received the returned initial notice, the only reasonable inference is that the notice, date stamped February 9, 1994, from Pasadena, was returned long before the tax sale on March 28, 1994.

Accordingly, once County became aware that Bank had not received notice regarding the tax sale, it knew that mailing the notice to the defunct post office box was futile. At that time, County should have made reasonable efforts to renotify Bank about the tax sale at an alternate address. In this case, the effort would have been minimal, as the address of Bank could be easily obtained. Because County failed to make any effort at all to renotify Bank about the tax sale, Bank's due process rights were violated and it has the right to set aside the tax sale.[11]

### III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed and the trial court is directed to enter an order that Bank is entitled to set aside the tax sale from County to Giant, and to proceed to trial on the bifurcated issue of whether Bank is estopped from invalidating the tax sale. Plaintiff shall recover costs on appeal.

Hollenhorst, Acting P. J., and Gaut J., concurred.

Petitions for a rehearing were denied April 10, 2000, and the petition of appellant Giant Inland Empire R.V. Center, Inc., for review by the Supreme Court was denied June 14, 2000. Baxter, J., and Chin, J., did not participate therein.

---

[11]Because the trial was bifurcated, the issue of whether the tax sale is void or whether Bank is estopped from voiding the tax sale may be determined at the second trial.

*See footnote, *ante*, page 1267.